**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JORDAN A. THOMAS,
40 Fairfield Beach Road
Fairfield, CT 06824,

PLAINTIFF,

v.

SECURITIES AND EXCHANGE
COMMISSION and ELAD L. ROISMAN, in
his official capacity as Acting Chairman of the
Securities and Exchange Commission,
100 F Street NE,
Washington, DC 20549

DEFENDANTS.

CIVIL ACTION NO.  **1:21-cv-108**

**COMPLAINT**

Plaintiff Jordan A. Thomas brings this civil action against Defendants U.S. Securities and Exchange Commission ("Commission" or "SEC") and Elad L. Roisman, in his official capacity as Acting Chairman of the SEC (collectively "Defendants"), for declaratory and injunctive relief, and alleges as follows:

**INTRODUCTION**

1.      Following the global financial crisis of 2008, Congress recognized that the Commission was in need of additional power, assistance, and money at its disposal to regulate securities markets. To assist the Commission in identifying securities law violations, Congress passed the Dodd-Frank Act, which created a new, robust whistleblower program designed to motivate people who know of securities law violations to come forward.

2.      Since its creation, the SEC's whistleblower program has been an unparalleled success. To date, the agency has received more than 40,000 reports, launched more than 1,000 investigations, returned more than $850 million to injured investors, and sanctioned wrongdoers more than $3 billion.

The American securities markets are unequivocally better as a result of this innovative investor protection program.

3.      Despite this incredible success, the Commission recently amended its whistleblower rules for the express purpose of decreasing the size and number of whistleblower awards it issues. *See Whistleblower Program Rules*, Rel. No. 34-89963, File No. S7-16-18, 2020 WL 5763381 (Sept. 23, 2020) ("Final Rule").

4.      Plaintiff Jordan Thomas, one of the most prominent whistleblower attorneys in the country, brings this action in order to vacate and set aside the Commission's unlawful new rules.

5.      Under the Dodd-Frank Act, the Commission "shall pay an award or awards to 1 or more whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement" of a covered action or "related action" in an amount equal to "not less than 10 percent . . . [and] not more than 30 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions." 15 U.S.C. §78u-6(b)(1).

6.      Under the Commission's prior rules, the agency calculated whistleblower awards by assigning an "award percentage" based on certain positive factors (*e.g.*, the significance of the information provided) and negative factors (*e.g.*, the culpability of the whistleblower). The Commission then issued an award by multiplying the "award percentage" by the total monetary sanctions collected by the SEC. The Commission did not take the size of the monetary sanctions into account when deciding the proper amount of the whistleblower award.

7.      These rules encouraged whistleblowers to come forward by guaranteeing that those individuals who acted properly would be awarded accordingly and would not have their awards unfairly and arbitrarily diminished.

8.      In 2018, however, the Commission changed course. In a proposal to amend its whistleblower rules, the Commission stated that its prior rules were leading to whistleblower awards

that were too large in situations where the SEC collected significant monetary sanctions. Accordingly, the Commission proposed to adopt a new rule that would allow the agency to consider the amount of the monetary sanctions collected (and the potential dollar amount of the whistleblower award) when calculating the whistleblower award and to lower whistleblower awards when they were based on high-dollar monetary sanctions. In doing so, the Commission explained that it needed to adopt a new rule because it had *no authority* under its current rules to lower whistleblower awards on the basis that the award was "unnecessarily large."

9.      After receiving fierce criticism, the Commission in September 2020 reversed course. According to the Commission, it had no need to adopt its proposed rule because the agency *already had discretion* to consider the potential dollar amount of the whistleblower award when calculating the award and to give lower whistleblower awards on this basis. Disregarding its rules and its prior public statements, the Commission adopted new language to "clarify" that the agency already had authority to give lower whistleblower awards based on the size of the monetary penalties collected.

10.      In reliance on the prior rules, courageous whistleblowers have put their careers and lives on the line to assist the Commission—including wearing FBI wires, testifying in high-profile trials, and smuggling key documents out of foreign countries. Now, in the middle of the proverbial football game, the Commission has moved the goal posts on literally hundreds of SEC whistleblowers.

11.      In the Final Rule, the Commission also amended its rules governing whistleblower awards for "related actions." Even though the Exchange Act mandates that the Commission "*shall pay an award*" in the successful enforcement of a "related action, in an aggregate amount" of 10% to 30%, the Commission imposed new barriers to whistleblowers recovering awards for "related actions." For example, the Commission now will not issue an award for a "related action" if, in the Commission's view, another whistleblower program has "the more direct or relevant connection to the action"—an additional limitation that is found nowhere in the statute.

12.     The Final Rule will have devastating effects on the Commission's whistleblower program because it will disincentivize knowledgeable individuals from coming forward and blowing the whistle.

13.     More important, the Final Rule's amendments to Rule 21F-6 are unlawful for at least five reasons: (1) the Final Rule was not a "logical outgrowth" of the proposed rule; (2) the Commission enacted the rule without ever acknowledging that it was changing its position; (3) the Commission failed to weigh the costs and benefits of the Final Rule because it (wrongly) believed that it had made no change at all; (4) the Commission adopted the rule without providing a reasoned explanation and despite the enormous harms it will cause the whistleblower program; and (5) the Commission had no statutory authority to enact the rule.

14.     In addition, the Final Rule's amendments to Rule 21F-3 are unlawful because, among other things, (1) the Commission had no statutory authority to enact the changes; and (2) the Commission adopted the rule without providing a reasoned explanation and despite the enormous harms it will cause the whistleblower program.

15.     The Final Rule's amendments to Rule 21F-6 and Rule 21F-3 are unlawful and must be enjoined, vacated, and set aside.

## PARTIES

### I.      The Plaintiff

16.     Plaintiff Jordan A. Thomas is an attorney in New York City, New York. Plaintiff is the Chair of the Whistleblower Representation Practice at Labaton Sucharow LLP ("Labaton"). In July 2011, Plaintiff founded Labaton's whistleblower practice, making Labaton the first national practice to exclusively focus on representing whistleblowers with information about possible violations of the federal securities laws.

17.     According to the New York Times, Plaintiff's whistleblower practice is "one of the top . . . in the country."[1] The Wall Street Journal has described him as "one of the most prominent attorneys representing whistleblowers before the government."[2] And NPR Planet Money has referred to him as "one of the top whistleblower lawyers in the country."[3]

18.     Plaintiff's first-of-its-kind whistleblower practice has experienced unprecedented success. He has successfully represented, among other clients, the first officer of a public company to win a whistleblower award, the first whistleblower to receive criminal immunity, and the first whistleblower to receive an award because his company retaliated against him. His clients have received some of the largest whistleblower awards in history, with three of his clients' cases involving monetary sanctions in excess of $100 million.

19.     Before joining Labaton, Plaintiff served as Assistant Chief Litigation Counsel and as Assistant Director in the U.S. Securities and Exchange Commission's Division of Enforcement. In these roles, he successfully investigated, litigated, and supervised a wide variety of high-profile enforcement matters. For his work on these cases, he received one Chairman's award, four Division Director Awards, and a Letter of Commendation from the U.S. Attorney for the District of Columbia.

20.     While serving at the Commission, he also had a leadership role in the development of the Commission's whistleblower program, including conducting fact-finding visits to other federal agencies with whistleblower programs, drafting the proposed legislation and implementing rules, and briefing Congressional staffs on the proposed legislation. In recognition of his contributions to the establishment of the program he received the Chairman's Law and Policy Award, as well as the

---

[1] Randall Smith, *Once an S.E.C. Regulator, Now Thriving as a Lawyer for Whistle-Blowers*, (Mar. 20, 2018), nyti.ms/2KTHA57.

[2] Gregory Zuckerman & Dave Michaels, *Bernie Madoff's Legacy: Whistleblower Inc.*, The Wall Street Journal (Dec. 8, 2018), on.wsj.com/33Behe9.

[3] Planet Money, *The Whistleblower Whisperer*, National Public Radio (May 29, 2019), n.pr/3mvcBdt.

Commission's Arthur Mathews Award, which recognized his "sustained demonstrated creativity in applying the federal securities laws for the benefit of investors."

21.     Plaintiff brings this extensive knowledge and experience of SEC enforcement and the whistleblower program into his whistleblower practice at Labaton. As a private whistleblower attorney, his mission is to level the playing field for his clients so that they can successfully report possible securities violations without personal and professional regrets.

22.     Plaintiff's clients are diverse, have come from numerous industries, and have reported a wide variety of significant securities violations. His clients are often senior executives and other knowledgeable individuals within companies. About 75% of them are insiders who work within the organization engaging in the reported securities violations. Almost two thirds of them work in the financial services industry.

23.     Plaintiff's practice is ultra-selective. Every year his team screens more than 300 potential cases, but he typically accepts fewer than 12 as clients.

24.     Plaintiff's representation of a whistleblower has typically been a seven-step process.

25.     First, he interviews potential clients about the possible securities violations that they wish to report.  During this phase, he accepts the representations made by these clients and focuses on whether they appear credible and their allegations constitute securities violations.

26.     Second, he conducts due diligence on the potential clients and their allegations. During this phase, he and his team conduct background checks on the clients, perform legal research on the violations, and attempt to independently corroborate some of the facts alleged by the clients.

27.     Third, he helps potential clients make the difficult decision whether to blow the whistle or not. During this phase, he educates his clients about the SEC Whistleblower Program, shares his initial legal and factual findings, and advises them regarding the realities of being a whistleblower in light of their goals and fears.

28.     Fourth, he assists clients in reporting possible securities violations to the Commission. During this phase, he and his team conduct additional legal research and attempt to strengthen the evidentiary record by, among other things, working with investigators, financial analysts, forensic accountants, and industry experts. Ultimately, Plaintiff develops a lengthy whistleblower submission that summarizes his legal and factual findings, identifies knowledgeable individuals, and produces potentially relevant evidence. Then, he files their whistleblower submissions with the Commission and later briefs the Staff.

29.     Fifth, Plaintiff and his clients assist the Staff with their investigations and any related prosecutions. During this phase, among many other things, he and his clients respond to factual and legal inquiries, review and comment on potentially relevant documents, and participate in related investigations and prosecutions—all at the request of the Staff. Throughout this period, Plaintiff also provides 24/7 legal and emotional support to his clients as they navigate difficult professional and personal terrain.

30.     Sixth, if the Commission collects a monetary sanction in which his client is eligible, Plaintiff prepares an application for an award from the Commission (called a Form WP-APP). During this phase, Plaintiff conducts legal research, reviews his clients' contributions over many years, and memorializes his findings in a lengthy legal memorandum with numerous exhibits.

31.     Finally, Plaintiff provides post-award counseling to his clients. During this phase, he provides a wide-variety of legal and other support services to help his clients manage potentially life-changing whistleblower awards.

32.     Plaintiff takes on whistleblower clients on a contingency fee basis. As a partner at Labaton, he receives a fixed percentage of whatever his client recovers in a whistleblower case as incentive compensation, less any case-related expenses.

33.     Since joining Labaton, Plaintiff has filed Form WP-APPs—applications for an award from the Commission—and his clients have recovered more than $125 million in whistleblower awards. For each of these awards, Plaintiff's firm received a contingency fee and Plaintiff received incentive compensation for recovering the award on behalf of his client.

34.     Plaintiff currently has nine whistleblower clients who have reported information to the Commission and are awaiting a final determination of whether they are entitled to an award under the Dodd-Frank Act. The monetary sanctions in these cases exceed $1 billion, and his clients collectively are eligible for awards of more than $300 million. On each of these potential awards, Plaintiff's firm will receive a contingency fee and Plaintiff will receive incentive compensation for recovering the award on behalf of his client.

35.     Plaintiff's clients are responsible for the Commission and other federal authorities collecting almost $2 billion in monetary sanctions, with violators going to jail and countless investors being protected from wrongdoing.

## II.     The Defendants

36.     Defendant U.S. Securities and Exchange Commission is an agency of the United States government within the meaning of 5 U.S.C. §551(1). The Commission promulgated and now enforces the Final Rule.

37.     Defendant Elad L. Roisman is the Acting Chairman of the Commission and is sued in his official capacity.

## JURISDICTION & VENUE

38.     This Court has subject-matter jurisdiction over this case because it arises under the laws of the United States. *See* 5 U.S.C. §§701, *et seq.*; 28 U.S.C. §§1331, 2201-2202.

39.     Venue is proper because the Commission resides in this District and a substantial part of the events or omissions giving rise to the claims occurred here. 28 U.S.C. §1391(b)(1)-(2).

## BACKGROUND

### I. The Dodd-Frank Act's Whistleblower Program

40. "[F]ollowing the global financial crisis of 2008, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act." *Reyher v. Grant Thornton, LLP*, 262 F. Supp. 3d 209, 215 (E.D. Pa. 2017). "Dodd-Frank responded to numerous perceived shortcomings in financial regulation." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 773 (2018). "Among them was the SEC's need for additional 'power, assistance and money at its disposal' to regulate securities markets." *Id.* (quoting S. Rep. No. 111–176, pp. 36-37 (2010)). "To assist the Commission 'in identifying securities law violations,' the Act established 'a new, robust whistleblower program designed to motivate people who know of securities law violations to tell the SEC.'" *Id.* (quoting S. Rep. No. 111–176, at 38).

41. To accomplish this "core objective" of motivating people to report violations, the Act gives "substantial monetary rewards" to whistleblowers. *Id.* at 777 (citation omitted). Congress did this because it recognized that "whistleblowers often face the difficult choice between telling the truth and . . . committing 'career suicide.'" *Id.* at 773-74 (quoting S. Rep. No. 111–176, at 111-12).

42. The Dodd-Frank Act states:

> In any covered judicial or administrative action, or related action, the Commission, under regulations prescribed by the Commission and subject to subsection (c), shall pay an award or awards to 1 or more whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement of the covered judicial or administrative action, or related action, in an aggregate amount equal to—
>
>> (A) not less than 10 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions; and
>>
>> (B) not more than 30 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions.

15 U.S.C. §78u-6(b)(1).

43. In Section 78u-6(c)(1)(B), Congress laid out the criteria the Commission must follow when determining the percentage amount of a whistleblower award:

> In determining the amount of an award made under subsection (b), the Commission—
>
> > (i) shall take into consideration—
> >
> > > (I) the significance of the information provided by the whistleblower to the success of the covered judicial or administrative action;
> > >
> > > (II) the degree of assistance provided by the whistleblower and any legal representative of the whistleblower in a covered judicial or administrative action;
> > >
> > > (III) the programmatic interest of the Commission in deterring violations of the securities laws by making awards to whistleblowers who provide information that lead to the successful enforcement of such laws; and
> > >
> > > (IV) such additional relevant factors as the Commission may establish by rule or regulation; and
> >
> > (ii) shall not take into consideration the balance of the Fund.

15 U.S.C. §78u-6(c)(1)(B).

44.     This award "shall be paid from" the Investor Protection Fund ("IPF" or "Fund"). *Id.* §78u-6(b)(2). The IPF is a separate fund "established in the Treasury of the United States," *id.* §78u-6(g)(1), and it is funded by monetary sanctions obtained in certain Commission enforcement actions, *id.* §78u-6(g)(3)-(4). If the amount of money in the IPF is "not sufficient to satisfy" a whistleblower award, the Commission will pay the rest of the whistleblower award with the monetary sanctions that it collects through the litigation generated by the whistleblower's information. *Id.* §78u-6(g)(3)(B). This ensures that the whistleblower is always paid in full.

## II.     The Prior Whistleblower Rules (2011)

45.     After Congress enacted the Dodd-Frank Act, the Commission promulgated rules to implement the new whistleblower program. *See Securities Whistleblower Incentives and Protections*, 76 Fed. Reg. 34300 (June 13, 2011) ("Prior Rule").

46.     The Prior Rule created Rule 21F-6, which determined whistleblower awards by calculating an "award percentage" based on certain positive and negative factors. The Prior Rule did

not consider the monetary sanctions collected (or the potential size of the whistleblower award) when

calculating whistleblower awards.

47.     The Prior Rule stated:

In exercising its discretion to determine the appropriate award percentage, the
Commission may consider the following factors in relation to the unique facts and
circumstances of each case, and may increase or decrease the award percentage based
on its analysis of these factors. . . .

(a) Factors that may increase the amount of a whistleblower's award. In
determining whether to increase the amount of an award, the Commission will
consider the following factors. . . .

(1) Significance of the information provided by the whistleblower. . . .

(2) Assistance provided by the whistleblower. . . .

(3) Law enforcement interest. The Commission will assess its
programmatic interest in deterring violations of the securities laws by
making awards to whistleblowers who provide information that leads
to the successful enforcement of such laws. . . .

(4) Participation in internal compliance systems. . . .

(b) Factors that may decrease the amount of a whistleblower's award. In
determining whether to decrease the amount of an award, the Commission will
consider the following factors . . .

(1) Culpability [of the whistleblower]. . . .

(2) Unreasonable reporting delay. . . .

(3) Interference with internal compliance and reporting systems. . . .

17 C.F.R. §240.21F-6 (2011); *see* Prior Rule, 76 Fed. Reg. at 34366-67.

48.     The Commission also proposed and finalized Rule 21F-3, which defined "related

action." This Rule provided that the Commission would pay an award based on amounts collected in

related actions. The Rule defined a "related action" as a "judicial or administrative action that is

brought by [specified agencies or self-regulatory organizations ('SROs')], and is based on the same

original information that the whistleblower voluntarily provided to the Commission, and that led the

Commission to obtain monetary sanctions totaling more than $1,000,000." 17 C.F.R. §240.21F-3

(2011); *see* Prior Rule, 76 Fed. Reg. at 34363-64.

### III.    The Successful Whistleblower Program

49.     Because of the SEC's whistleblower program, individuals from all walks of life began to break their silence and blow the whistle on a wide-variety of possible securities violations related to, for example, corporate disclosures and financials, offering fraud, manipulation, crypto-currency, insider trading, trading and pricing, the Foreign Corrupt Practices Act, unregistered offerings, market events, municipal securities, and public pensions.

50.     Since the beginning of the program, the Commission has received tens of thousands of tips, coming from every state and territory in the United States and approximately 130 foreign countries. Over 1,000 tips have led to formal investigations.

51.     Enforcement actions from tips have generated more than $2.7 billion in monetary sanctions, including more than $1.5 billion in disgorgement of ill-gotten gains and interest, of which $850 million has been, or is scheduled to be, returned to harmed investors.

52.     At the end of fiscal year 2020, the Commission had awarded almost $562 million to 106 whistleblowers.

### IV.    Proposed Amendments to the Commission's Whistleblower Rules (2018)

53.     Despite the enormous success of the Commission's whistleblower program, the Commission in 2018 sought to amend its rules to decrease the number and size of the awards it issued.

54.     On June 28, 2018, the Commission proposed to adopt a new rule that would, among other things, amend the whistleblower award criteria in Rule 21F-6 and amend the definition of "related action" in Rule 21F-3. *See Amendments to the Commission's Whistleblower Program Rules*, Rel. No. 34-83557, File No. S7-16-18, 2018 WL 3238771 (June 28, 2018) ("Proposed Rule").

55.     According to the Commission, Rule 21F-6 had caused some whistleblowers to receive awards that were too large. "[A]s the dollar value of an award amount grows exceedingly large, there is a significant potential for a diminishing marginal benefit to the program in terms of compensating

the whistleblower and incentivizing future whistleblowers." *Id.* at *21. The Commission believed it was "in the public interest that [the Commission] scrutinize the dollar impact of these awards more carefully" by "assess[ing] the award factors . . . in terms of dollar amounts, not merely in terms of award percentages," and "where appropriate, adjust an award downward so that the dollar amount of the payout is more in line with the program's goals of rewarding whistleblowers and incentivizing future whistleblowers from a cost-benefit perspective." *Id.* at *20-21 & n.99. The Commission also expressed concern that large awards would "cause the funds in the IPF to be diminished" and thus would cause the IPF to not be used "efficiently and effectively to achieve the program's objectives." *Id.* at *24.

56.     The Commission recognized that it needed to amend Rule 21F-6 to achieve these goals. It explained that, "under the existing framework of Rule 21F-6[,] . . . the Commission in setting the appropriate amount of an award [is] unable to consider . . . extraordinarily large dollar amounts that [are] associated with any assessments and adjustments made when applying the existing award factors of Rule 21F-6." *Id.* at *21. And it explained that it "also lack[ed] the authority to adjust [an] award amount downward if it [finds] that amount unnecessarily large for purposes of achieving the whistleblower program's goals." *Id.*

57.     The Proposed Rule thus proposed to add the following paragraph to Rule 21F-6:

*(d) Additional considerations in connection with certain large awards where the monetary sanctions collected would equal or exceed $100 million.* When considering any meritorious whistleblower award application where the whistleblower's original information led to one or more successful covered or related action(s), collectively, that resulted in the collection of $100 million or more in monetary sanctions or will likely result in such collections . . . , the Commission shall determine the award amount as specified in paragraphs (d)(1) through (4) of this section. . . .

(1) When applying the award factors in paragraphs (a) and (b) of this section, the Commission shall make any upward or downward adjustments by considering the impact of the adjustments on both the award percentage and the approximate corresponding dollar amount of the award. If the resulting payout would be below $30 million . . . , then the downward adjustment provided for in paragraph (d)(2) of this section shall not be applicable.

(2) After completing the award analysis required by paragraph (d)(1) of this section and determining the total dollar amount of the potential award for any action(s) based upon the whistleblower's original information, the Commission shall consider whether that amount exceeds what is reasonably necessary to reward the whistleblower and to incentivize similarly situated whistleblowers. If the Commission finds that the total payout for any action(s) based upon the whistleblower's original information would exceed an amount that is reasonably necessary, it may adjust the total payout for the action(s) downward to an amount that it finds is sufficient to achieve those goals. As is the case with every aspect of any award determination under this section, the Commission shall not consider the balance of the Investor Protection Fund ("IPF") when determining whether to make an adjustment to an award under this paragraph (c).

(3) Any downward adjustment to a whistleblower's award for any actions based upon the whistleblower's original information under paragraph (d)(2) of this section shall under no circumstances yield a potential total payout on all the actions, collectively . . . of less than either $30 million . . . .

(4) Further, any adjustments under paragraph (d)(2) of this section shall in no event result in the total amount awarded to all meritorious whistleblowers, collectively, for each covered or related action constituting less than 10 percent of the monetary sanctions collected in that action.

Proposed Rule, 2018 WL 3238771, at *82-83.

58.    The Commission gave an example of why it believed the Proposed Rule was necessary:

[C]onsider the settlements that the Commission and DOJ entered with Siemens AG in 2008. The total monetary sanctions collected in these two actions was $800 million . . . Suppose that these two actions occurred today and that these actions were based on original information voluntarily provided to the Commission by an eligible whistleblower. In such a situation, the Commission would be required to pay an award to that whistleblower of between $80 million (a 10 percent award) and $240 million (a 30 percent award) for the two actions. . . . [I]f the hypothetical meritorious whistleblower were an individual who did everything right in connection with his or her whistleblowing (that is, he or she were the model whistleblower), the Commission would almost certainly be obligated to pay this individual an award at or near the maximum $240 million level under the existing rules. What paragraph (d) would do . . . is to afford the Commission the discretion to determine whether such an extraordinarily large payout is actually necessary to further the whistleblower program's goals of rewarding whistleblowers and incentivizing future whistleblowers, and if not, proposed paragraph (d) would afford the Commission the ability to adjust the actual payout to an award amount that is closer to the $80 million minimum that would be required to be paid pursuant to Section 21F(b). We believe that adopting paragraph (d) to afford us a discretionary mechanism to make such common-sense adjustments to extraordinarily large awards to ensure that they do not exceed an amount that is appropriate to achieve the goals and interests of the program is, to put it simply, good public policy.

- 14 -

*Id.* at *21.

59.     Importantly, the Commission stated that the proposed rule change would apply only to *future* whistleblower applications. *See* Proposed Rule, 2018 WL 3238771, at *18 n.96 ("The Commission anticipates this proposed rule change, if adopted, would apply only to covered-action and related-action award applications that are connected to a Notice of Covered Action . . . posted on or after [the] effective date of the final rules.").

60.     In addition to these changes, the Commission also proposed significant changes to the definition of "related action" in Rule 21F-3. The Commission proposed to redefine "related action" to pay an award for another agency's enforcement action *"only if* the Commission finds . . . that its whistleblower program has the more direct or relevant connection to the action." Proposed Rule, 2018 WL 3238771, at *14-18, *80-81 (emphasis added).

61.     The Commission also proposed additional limits on when a whistleblower could recover for a "related action." Under the Proposed Rule:

> [T]he Commission will not make an award to you for the related action if you have already been granted an award by the authority responsible for administering the other whistleblower award program. Further, if you were denied an award by the other award program, you will not be permitted to readjudicate any issues before the Commission that the authority responsible for administering the other whistleblower award program resolved against you as part of the award denial. Additionally, if the Commission makes an award before an award determination is finalized by the authority responsible for administering the other award scheme, the Commission shall condition its award on the meritorious whistleblower making a prompt, irrevocable waiver of any claim to an award from the other award scheme.

*See id.* at *81.

62.     Two Commissioners, Robert Jackson and Kara Stein, dissented from the proposed rule. Commissioner Jackson warned that the proposed rule would insert "uncertainty and politics" into the whistleblower program—uncertainty for potential whistleblowers over the amount of the eventual award, and politics for Commissioners in the award-setting process, since future Commissioners may face political pressure or motivation to lower whistleblower awards. *See* Comm'r

Robert J. Jackson, Jr., *Statement on Proposed Rules Regarding SEC Whistleblower Program* (June 28, 2018), bit.ly/3fQeKOw. Commissioner Jackson lamented this change, explaining that "the purpose of the whistleblower program is not to maximize the utility of whistleblowers, but instead to maximize deterrence." *Id.* at n.7.

63.     Commissioner Stein, in dissent, explained that by empowering the Commission "to consider not just the enumerated factors, but also the overall dollar amount of the award," the Proposed Rule would allow the Commission to "reduce the award if, in its sole discretion, it thinks the award is 'too large.'" Comm'r Kara M. Stein, *Statement on Proposed Amendments to the Commission's Whistleblower Program Rules* (June 28, 2018), bit.ly/3odvPoH. This would effectively empower the Commission to "take into consideration the balance of the Fund," which was "inconsistent with [Congress's] explicit instructions." *Id.* Commissioner Stein also worried that "that this subjective determination will be used as a means to weaken the Whistleblower Program." *Id.*

64.     The Commission received fierce criticism of the Proposed Rule. Commenters argued that the proposed amendment to Rule 21F-6, among other things, conflicted with the plain language of the Exchange Act and contradicted the Congressional goal to increase whistleblower awards and incentivize cooperation with law-enforcement officials.

65.     Commenters also argued that the proposed amendments to Rule 21F-3, among other things, violated the Exchange Act's command that the Commission "shall pay" all related action awards and would disincentivize whistleblowers from coming forward to report securities violations.

**V.     The Final Rule (2020)**

66.     On September 23, 2020, the Commission adopted amendments to its whistleblower rules. *See Whistleblower Program Rules*, Rel. No. 34-89963, File No. S7-16-18, 2020 WL 5763381 (Sept. 23, 2020) ("Final Rule").

67.     In the Final Rule, the Commission abruptly changed course from its initial proposal to amend Rule 21F-6. According to the Commission, an amendment to Rule 21F-6 was unnecessary because, in fact, the Commission *already* had "discretion to consider the dollar amount of monetary sanctions collected when considering the existing Award Factors and setting the Award Amount." Final Rule, 2020 WL 5763381, at *64. Thus, rather than creating the discretion to consider dollar amount, the Proposed Rule would have simply "expressly stated" that the Commission always had this discretion and "provided a specific mechanism to guide the Commission's existing discretion to determine awards, specifically in the context of large awards." *Id.* at *27, *72. The Commission decided that it was "not necessary to adopt the formalized mechanism for the Commission to exercise its discretion to apply the Award Factors and set Award Amounts." *Id.* at *29.

68.     Under the Prior Rule, whistleblower awards were calculated as percentages:

> In exercising its discretion to determine the appropriate award *percentage*, the Commission may consider the following factors in relation to the unique facts and circumstances of each case, and may increase or decrease the award *percentage* based on its analysis of these factors.

Prior Rule, 76 Fed. Reg. at 34366 (emphasis added).

69.     The Final Rule amended this language to "clarify" that the Commission already had the authority to consider the potential dollar amount of the whistleblower award when calculating a whistleblower award. *See* Final Rule, 2020 WL 5763381, at *22. This "clarification"—which was not proposed in the Proposed Rule—amended the first sentence of Section 240.21F-6 to state:

> In exercising its discretion to determine the appropriate *award*, the Commission may consider the following factors (and only the following factors) in relation to the facts and circumstances of each case in setting the *dollar or percentage amount* of the award.

*Id.* at *84 (emphasis added).

70.     Importantly, because the Commission claimed that it had always had this discretion, the agency now claimed the authority to give lower whistleblower awards based on the size of the

dollar amount for applications that had already been filed. *Id.* This change directly contradicted the Proposed Rule's statement that its actions would apply only to future applications.

71.     Because the Commission believed that its amendments to Rule 21F-6 merely "clarif[ied]" that the Commission "has the authority to consider the dollar amount when applying the award criteria," the Commission found that its rule would have no "significant benefits, costs, and economic effects" or "significantly impact efficiency, competition, and capital formation." *Id.* at *73.

72.     The Final Rule also finalized its proposals to amend the definition of "related action" in Rule 21F-3. The Final Rule states that "if a judicial or administrative action is subject to a separate monetary award program established by the Federal Government, a state government, or a self-regulatory organization, the Commission will deem the action a related action only if the Commission finds (based on the facts and circumstances of the action) that its whistleblower program has the more direct or relevant connection to the action." Final Rule, 2020 WL 5763381, at *82.

73.     In determining whether a potential related action has a "more direct or relevant connection to the Commission's whistleblower program than another award program," the Commission will consider "the nature, scope, and impact of the misconduct charged in the potential related action, and its relationship to the Federal securities laws." *Id.*

74.     In addition, the Final Rule contains a number of provisions allowing the Commission to avoid paying whistleblowers awards for related actions:

> If the Commission determines to deem the action a related action, the Commission will not make an award to you for the related action if you have already been granted an award by the governmental/SRO entity responsible for administering the other whistleblower award program. Further, if you were denied an award by the other award program, you will not be permitted to readjudicate any issues before the Commission that the governmental/SRO entity responsible for administering the other whistleblower award program resolved against you as part of the award denial. Additionally, if the Commission makes an award before an award determination is finalized by the governmental/SRO entity responsible for administering the other award program, the Commission shall condition its award on the meritorious whistleblower making a prompt, irrevocable waiver of any claim to an award from the other award program.

Final Rule, 2020 WL 5763381, at *83.

75.     Two Commissioners, Allison Lee and Caroline Crenshaw, dissented from the Final Rule. Commissioner Lee's dissent recognized the multiple contradictions between the proposal to amend Rule 21F-6 and the Final Rule. In the proposal to amend Rule 21F-6, the Commission claimed that "we needed a rule that would allow us the discretion to consider dollar amounts, but that our proposed rule would limit the use of that discretion to only cases in which the money collected totaled at least $100 million." Comm'r Allison Herren Lee, *June Bug vs. Hurricane: Whistleblowers Fight Tremendous Odds and Deserve Better* (Sep. 23, 2020), bit.ly/2TNOWZe ("Lee Dissent"). But the Commission's Final Rule now "claim[s] that we do not need a new rule at all, that we've had this discretion all along." *Id.* And, at the same time, the Commission still amended its rules to "claim the authority to use that discretion, labeling it a 'clarification.'" *Id.* (citation omitted).

76.     Commissioner Lee explained the effect of the Final Rule's amendment of Rule 21F-6 through a hypothetical she had posed to her fellow Commissioners during their deliberations:

> Under the rule we adopt today, assume two cases: in both cases, we are presented with the exact same whistleblower and exactly the same facts in every way. The only difference is that in Case A, the monetary sanctions collected total $10 million, while in Case B, the monetary sanctions collected total $500 million. Under this new interpretation of our authority, I asked, can the Commission reach a different award *percentage* between these two cases? Again, not one single fact is different except the dollar size of the potential award. The answer I was given was an unequivocal "yes."
>
> That tells me everything I need to know about what can or cannot be considered under this new rule. If we were going to be confined to the existing original factors under the new rule, there should be no difference in the outcome—in terms of the percentage of the award—between Case A and Case B.

*Id.*

77.     As Commissioner Lee explained, the Commission now "claim[s] a new discretion to consider dollar amount in the setting of award amounts that is broader than the discretion we proposed . . . [and] applicable to all awards no matter their size." *Id.* Moreover, "the rule will not

require the Commission to tell whistleblowers if or when we have exercised this discretion," and it "provides whistleblowers no way to contest its application." *Id.* There is thus "no transparency[] and no accountability" in the award process. *Id.*

78.     At the public meeting, before the Commissioners voted on the new whistleblower rules, Commissioner Lee asked the Commission's General Counsel, Robert Stebbins, about her hypothetical and whether she had accurately summarized the Commission's asserted discretion to make award determinations. On the record, he confirmed that she had accurately summarized the Commission's legal position. At no time did any other Commissioner challenge Commissioner Lee's description of their deliberations or legal position.

79.     Commissioner Lee also objected to the Commission's amendment to the definition of "related action" in Rule 21F-3. She explained that, although "the statutory text dictating that we 'shall pay' awards in related actions is unambiguous, we are today adopting a rule that decreases certainty by introducing a new, subjective standard, which is whether another agency's whistleblower program has a 'more direct or relevant connection to the action.'" *Id.* If the Commission "determine[s] that it does, the whistleblower must recover separately from that agency's program." *Id.* This change would thus undermine the ability of the Commission to "promote[] efficiency and certainty for whistleblowers by ensuring that they will get an award when other parts of the government act on a whistleblower's tip," and frustrate the Commission's efforts to "encourage[] whistleblowers to choose to bring information to us, knowing they will still receive an award if the information is directed to a different agency." *Id.*

## VI.    The Impact of the Final Rule on the Plaintiff

80.     The Final Rule's amendments to Rules 21F-6 and 21F-3 have harmed and will continue to harm Plaintiff.

### A.    The Final Rule's Amendment to Rule 21F-6

81.     The Final Rule's amendments to Rule 21F-6 harm Plaintiff in at least six ways.

82.     *First*, the Final Rule will reduce the amount of the awards that Plaintiff's current clients will recover which will, in turn, lower his law firm's contingency fee and his incentive compensation.

83.     As of January 11, 2021, Plaintiff has nine clients whose applications for award are pending with the SEC Whistleblower Office, 28 clients whose cases are being actively investigated by the Commission Staff, and two clients whose whistleblower submissions he is currently preparing to file with the Commission. When the Commission exercises its new discretion to reduce their awards, Plaintiff's law firm's contingency fee and Plaintiff's incentive compensation will be reduced as well.

84.     Plaintiff knows of at least five of his cases, in particular, where the size of the monetary sanctions are or will likely be so large that the Commission will exercise its new discretion to lower the award his clients receive.

85.     Many of these clients have put their careers and lives on the line to assist the Commission. One client risked being imprisoned to smuggle key evidence of a large-scale securities fraud out of China. Some have worn FBI wires and agreed to publicly testify against wrongdoers. And a few have lost their jobs, been blacklisted, and endured substantial financial hardships that have required them to take loans from family members and litigation funders. All of them relied on the governing statute and the whistleblower program's implementing rules when they decided to blow the whistle. The Commission is breaking faith with these courageous whistleblowers.

86.     *Second*, the Final Rule increases Plaintiff's marketing costs and related expenses by requiring him to change his business model for locating potential clients.

87.     Since 2011, in reliance upon the Prior Rule, Plaintiff has led a low-volume, ultra-selective whistleblower practice that has depended on a handful of large whistleblower awards to be successful.

88.     Historically, the vast majority of Plaintiff's clients were referred to him by other attorneys. Plaintiff consistently found that attorney referrals were much more likely to become actual clients (and lead to high-dollar awards) than all other potential clients.

89.     Because of the Final Rule, however, Plaintiff can no longer rely on referrals and large whistleblower awards to sustain his whistleblower practice. That is because Plaintiff knows that the Commission is likely to lower the awards that his clients recover on the basis that they are "too large." Plaintiff therefore must make costly changes to the business model and practices he developed in reliance on the Prior Rule in order to expand his pool of potential clients.

90.     Following the publication of the Final Rule, for the first time ever, Plaintiff retained an advertising agency to directly market to potential SEC whistleblowers. In January 2021, the agency launched an initial $150,000 marketing campaign for his practice. Plaintiff must pay for this campaign out of the fixed operating budget for his whistleblower practice. As a consequence, Plaintiff now has less money in his budget to pay the attorneys assigned to his practice and other expenses necessary to build his practice. In addition, if Plaintiff exceeds his fixed operating budget before the end of the year, then he must pay for any additional costs himself.

91.     Plaintiff's costs will not end with this advertising campaign. Unlike his traditional attorney referrals, the individuals who come to him through this marketing campaign will be less likely to have valid claims and become future clients. Plaintiff will need to spend numerous hours reviewing and evaluating claims that are less likely to yield whistleblower awards.

92.     *Third*, the Final Rule requires Plaintiff to spend numerous attorney hours doing additional research and analysis before accepting a case.

93.     As the Chair of the Whistleblower Representation Practice at Labaton, Plaintiff is responsible for selecting the whistleblower clients he represents. Two important factors he considers

in deciding whether to represent a client are (1) the likely monetary sanctions the SEC will collect and (2) the likely client award.

94.     Plaintiff must be highly selective because representing a whistleblower is not easy or cheap. Representing whistleblowers is an expensive and time-consuming process, especially because Plaintiff is unique in offering high-touch round-the-clock services to his clients, many of whom are enduring one of the most stressful situations of their lives.

95.     Before the Final Rule, Plaintiff could assess the economic potential of a case fairly predictably. Based on historical data, along with case-specific information provided by the client, Plaintiff could estimate the likely monetary sanctions that the SEC will collect. Similarly, based on historical data, coupled with his and his team's experience representing other whistleblowers, Plaintiff could review the positive and negative factors in Rule 21F-6 and estimate the likely award percentage for each case.

96.     Now, however, the Final Rule requires Plaintiff to speculate when and how the Commission will exercise its discretion to lower the client award based on the size of the monetary sanctions the Commission will collect.

97.     The Commission has indicated that "[f]acts that would be relevant to determining whether [a] large payout is necessary and appropriate" include, among others, "whether the whistleblower made an extraordinary and highly unusual sacrifice by coming forward (such as placing himself or herself in legal jeopardy to bring the Commission information that it would otherwise not have been able to obtain or demonstrably suffering career-ending consequences commensurate with the potential large award), . . . the industry in which knowledgeable whistleblowers might work, the type of position held by that whistleblower, and the compensation levels within that industry, and the compensation levels within that industry, and whether potential whistleblowers may be located

overseas and the likely compensation levels in those countries." Proposed Rule, 2018 WL 3238771, at *25 (footnotes omitted).

98.     As a result, in larger cases, Plaintiff now must interview the potential clients to determine whether any of these facts apply to them. Then, based upon the extended interview, Plaintiff must evaluate whether the Commission is likely to lower the potential client's award and, if so, by how much. These are hours of Plaintiff's time—time that most attorneys bill by the hour for—that Plaintiff can no longer devote to other matters. This new work also increases Plaintiff's operating expenses, including attorney time, and thus depletes Plaintiff's limited operating budget for his whistleblower practice.

99.     *Fourth*, the Final Rule will cause fewer of Plaintiff's clients to ultimately report possible securities violations to the Commission, thereby reducing Plaintiff's practice's revenue and his incentive compensation.

100.     Being a whistleblower is not always easy, glamourous, or even lucrative. Sophisticated potential whistleblowers, like Plaintiff's typical clients, know this. While a large percentage of employees are aware of misconduct in the workplace, only a fraction of them ever report it. The Commission's whistleblower program is designed to combat this significant law enforcement problem.

101.     When deciding whether to report possible violations, potential whistleblowers must reconcile conflicting societal values and engage in a cost-benefit analysis. Like the analyses they conduct in their jobs in corporate America or on Wall Street, these potential whistleblowers evaluate the benefits associated with reporting possible securities violations to the Commission against the costs of doing so.

102.     In Plaintiff's experience, the potential for large monetary awards is the primary motivation for individuals to blow the whistle to law enforcement and regulatory authorities.

Sophisticated whistleblowers evaluate this benefit by closely assessing the probability of success, the size of the potential award, and the time it will take to achieve it.

103.    Plaintiff has consistently found that the more senior, salaried, and tenured the potential whistleblower is, the less risk or uncertainty he or she is willing to accept.

104.    The Final Rule adds extreme uncertainty into Plaintiff's clients' cost-benefit analysis. Effectively, it turns the Commission into a kind of casino that aggressively courts high-rollers with the promise of large jackpots but reserves the right to lower their winnings if those winnings get "too large."

105.    In addition, when evaluating whether to report possible securities violations to the Commission, potential SEC whistleblowers often do not trust the government. Plaintiff knows this from personal experience, and this distrust is supported by academic research. This skepticism of the government will be heightened when potential whistleblowers learn that the government has the discretion to lower their awards based on the size of the monetary sanctions collected.

106.    Under the Final Rule, Plaintiff now must advise clients of the risk that the Commission may lower their whistleblower awards if it thinks that the award is "too large." When informed of the risk, some potential clients will weigh the costs and benefits and choose not to report possible violations to the SEC.

107.    Indeed, after the Final Rule was adopted, Plaintiff spoke with 12 of his current Wall Street clients. All of them were concerned about whether and how the Commission would exercise this discretion in their cases. All of them shared with him that the original decision to become a whistleblower was a very difficult one and the new risk that the Commission could lower their whistleblower award would have made them less likely to report. One executive, who annually earns more than $10 million a year, stated unequivocally that he never would have reported if he knew the Commission would adopt the Final Rule.

108.     Based on Plaintiff's work with SEC whistleblowers over the last decade, and his recent interviews with current clients, Plaintiff has no doubt that the Final Rule will reduce the number of individuals who will become SEC whistleblowers. This is particularly true for the most senior, salaried, and tenured executives on Wall Street, who make up about two-thirds of Plaintiff's clients.

109.     *Fifth*, the Final Rule will increase Plaintiff's costs and expenses associated with filing applications for awards for his current and future clients.

110.     Based on prior years and his current pipeline of cases, Plaintiff anticipates filing at least 3-5 applications for award in 2021.

111.     For future applications for award, where the Commission may exercise discretion to lower the whistleblower award, the Final Rule forces Plaintiff to explain to the Commission why it should not apply its new discretion to lower his clients' whistleblower awards. Plaintiff must now address numerous factors to convince the Commission that the award is not "too large" and does not need to be reduced based on its size.

112.     Since the Commission lacks the necessary knowledge, experience, and data to independently make such a determination, Plaintiff will have the burden of proof. To satisfy this burden, Plaintiff will have to hire an industry expert to draft a report addressing, among other things, the realities of being a known or suspected whistleblower in each client's industry and geographic region, including the likelihood of his client being blacklisted. To supplement this opinion, Plaintiff will have to hire an economist to conduct a comprehensive study of each client's work history, industry, and geographic region, so that the economist can draft a report for the Commission regarding the net present value of that client's likely future earnings. Hiring qualified experts and working with them will be complex, time consuming, and expensive—especially since his clients will have only 90 days from the Commission's Notice of Eligibility to the deadline for filing their applications for

award. In cases like these, as a result of the Final Rule, Plaintiff anticipates spending $30,000 to $50,000 on expert consulting services.

113.   These expenses will directly lower Plaintiff's incentive compensation. Under Plaintiff's arrangement with his law firm, the firm calculates his incentive compensation by (1) deducting case-related expenses from the contingency fee paid by his clients and then (2) paying him a fixed percentage of this new amount.

114.   In addition, when the Commission issues its preliminary award determinations for Plaintiff's clients that are less than 30% and may have been the result of the Commission exercising its new discretion, Plaintiff will now need to (1) "request that the Office of the Whistleblower make available for [his] review the materials . . . that formed the basis of the Claims Review Staff's Preliminary Determination"; (2) "request a meeting with the Office of the Whistleblower," to determine whether and by how much the Commission reduced by clients' awards because of their size; and (3) "contest the Preliminary Determination made by the Claims Review Staff by submitting a written response to the Office of the Whistleblower setting forth the grounds for [his] objection to . . . the proposed amount of an award," arguing that the Commission should not have reduced the award amount because of its size.  17 C.F.R. §§240.21F-10(e)(1), 240.21F-11(e)(1).

115.   Prior to the Final Rule, since 2011, Plaintiff had only requested the record that formed the basis of the Staff's Preliminary Determination four times. Plaintiff had never requested a meeting with the Office of the Whistleblower. And Plaintiff has requested that the Commission reconsider a client's Preliminary Determination on only one occasion. When Plaintiff did seek reconsideration, he hired an appellate firm to assist his client and paid the firm more than $50,000. The Final Rule will now require Plaintiff to review the record, meet with the Office of Whistleblower staff, and challenge the Staff's Preliminary Determinations more frequently, which will further increase his practice's costs and expenses.

116.    *Finally*, for future potential clients who are still willing to be SEC whistleblowers after being properly advised, the Final Rule will reduce the size of their eventual award which will, in turn, lower Plaintiff's firm's contingency fee and his incentive compensation.

**B.    The Final Rule's Amendment to Rule 21F-3(b)**

117.    The Final Rule's amendment to Rule 21F-3 harms Plaintiff's practice in at least nine ways.

118.    *First*, the Final Rule requires Plaintiff to file additional applications for award for clients, which has increased his operating expenses and costs.

119.    Under the prior rules, Plaintiff needed to file his client's whistleblower tip only with the Commission. If the Commission shared his client's tip with another agency or SRO, his client would still be eligible to receive a "related action" award from the Commission, even if the agency or SRO that received his client's tip had its own whistleblower program.

120.    The Final Rule eliminates this certainty. In cases where the Commission and other law enforcement or regulatory authorities bring related enforcement actions, the new rule empowers the Commission to decline to pay a whistleblower award for the monetary sanctions associated with the related action if it concludes that another agency's whistleblower program has a "more direct or relevant connection to the action." As a result, Plaintiff now must file applications for award with these other programs to ensure that his clients receive an award from at least one of the programs.

121.    Drafting and filing applications for awards is time consuming and expensive. To illustrate, on September 23, 2020, the Commission adopted the Final Rule. Six days later, the agency announced a $35 million settled enforcement action against JPMorgan Securities LLC. Simultaneously, in parallel related actions, the CFTC and DOJ announced joint settled enforcement actions against JPMorgan Chase & Co., JPMorgan Chase Bank N.A., and JPMorgan Securities. Collectively, JPMorgan was required to pay $920.2 million.

122.     Plaintiff currently represents an individual who is seeking to recover an award based on the whistleblower tips he provided. Under the prior rules, Plaintiff could have filed just one application for award that covered both the sanctions collected by the Commission and those associated with the related DOJ settlement. Now, however, Plaintiff was required to file separate applications with the Commission and the CFTC, each seeking an award for the monetary sanctions associated with DOJ's settlement. Plaintiff was forced to spend approximately 40 hours researching, drafting, and filing this additional CFTC application. Overall, the additional (unnecessary) CFTC application required more than 175 attorney hours and had a total lodestar in excess of $150,000.

123.     *Second*, the Final Rule introduces timing issues that will reduce the amount of award Plaintiff's clients will recover, which will, in turn, lower his law firm's contingency fee and his incentive compensation.

124.     The Commission and other potential whistleblower programs have different whistleblower-award procedures and processing times. For instance, the SEC typically takes two to three years to process applications for award, while the CFTC takes one to two years to process applications.

125.     Under the Final Rule, these timing differences between the Commission and other whistleblower programs pose significant issues for Plaintiff's clients. If the Commission determines that an award for a "related action" is appropriate, his client is now required to make "a prompt, irrevocable waiver of any claim to an award from the other award program," even if the other program has not made a determination regarding the client's eligibility and award amount.

126.     Similarly, if another whistleblower program determines that an award is appropriate, Plaintiff's client may not receive a related action award from the Commission if he had "already been granted an award by the other governmental [or SRO] entity."

127.    In practice, these timing differences mean that Plaintiff's clients will be forced to blindly accept the first award offered to them, regardless of its size, rather than risk getting nothing. Since the Final Rule prevents them from selecting the largest award to which they were (formerly) eligible, his clients will receive smaller whistleblower awards. These lower awards will, in turn, lower Plaintiff's incentive compensation.

128.    *Third*, the Final Rule will increase the possibility that Plaintiff's client will be denied a whistleblower award by the Commission on the basis that another agency or SRO already denied his client an award.

129.    Under the Final Rule, Plaintiff's clients have been placed between a rock and a hard place. On the one hand, if the Commission determines that another whistleblower program "has the more direct or relevant connection to the action," Plaintiff's clients will be denied an award for a related action, so they are strongly incentivized to apply to any and all programs that they may be eligible for. On the other hand, if any of these other whistleblower programs deny their award applications, for any reason, Plaintiff's clients will be barred from receiving an award from the Commission. This prohibition is mandated by the Final Rule, even though award proceedings are not litigation, the proceedings are not governed by the same rules, and the proceedings don't involve the same parties.

130.    Notwithstanding these material facts, Plaintiff's clients will be forced to choose, and some will lose. In fact, award programs regularly deny whistleblowers' applications for awards. For example, from 2011 through 2020, more than 66% of all Commission whistleblower program orders have been denials.

131.    When the Commission denies "related action" awards based on these grounds, Plaintiff's clients will receive smaller whistleblower awards. This, in turn, will lower Plaintiff's incentive compensation.

132.    *Fourth*, the Final Rule requires Plaintiff to do additional research and analysis about his clients' eligibility for other potential whistleblower programs before accepting a case, which has increased his operating expenses.

133.    As explained, under the Final Rule, if the Commission determines that another whistleblower program "has the more direct or relevant connection to the action" Plaintiff's clients will be denied an award for a "related action," so they are strongly incentivized to apply to other whistleblower programs. Accordingly, before accepting a new case, Plaintiff now must identify other potential whistleblower programs, evaluate the probability of a related action, and estimate the size of any related action and whistleblower award.

134.    Depending upon the case, and the relevant programs, this review process can be time consuming. Plaintiff first must learn the various programs' fundamentals: procedures for submitting a tip, eligibility requirements, opportunity to report anonymously, available employment protections, award criteria, minimum and maximum awards, extent of discretion, source of award payment, procedures for applying for an award, process for appealing award determinations, and how awards are taxed. Next, Plaintiff must research the relevant agency's enforcement history, including current leadership priorities, past enforcement actions, and whether whistleblowers have been outed during the agency's cases. Finally, Plaintiff must investigate the awards the programs have granted. Under the prior rules, this type of inquiry was not required. These new inquiries cost Plaintiff time and money to conduct.

135.    *Fifth*, the Final Rule will reduce the number of future cases Plaintiff accepts if the clients' information could result in a "related action," which will, in turn, reduce client recoveries and Plaintiff's incentive compensation.

136.    As the Chair of the Whistleblower Representation Practice at Labaton, Plaintiff is required to select the clients he represents. The stakes are high because Plaintiff works on a

contingency basis and his cases demand a substantial investment of time and resources, often between five and seven years. Accordingly, Plaintiff's success in selecting cases depends upon conducting a detailed qualitative and quantitative analysis of potential cases using proprietary SEC enforcement and award databases.

137.    Unfortunately, for many of the other whistleblower programs that the Commission may deem to have "the more direct or relevant connection to the action," there is limited available information about the organization's enforcement history and track record of paying whistleblower awards. And what is known about these programs' fundamentals is discouraging because virtually all of their award determinations are discretionary, the awards are paid for out of the agency's annual operating budget (which biases the organization to making smaller awards), and the maximum potential awards are much smaller than the SEC Whistleblower Program.

138.    For example, the award provision of the Major Frauds Act, which is administered by the Attorney General, authorizes payment of an award to a person who has furnished information relating to a possible fraud against the United States. But payment is within the sole discretion of the Attorney General, the amount of the award is limited to $250,000, a decision by the Attorney General not to pay an award is nonreviewable, and there are no mechanisms for anonymous reporting. *See* 18 U.S.C. §1031.

139.    Accordingly, under the Final Rule, the greater the probability of a related action, the lower the probability that Plaintiff will accept the case. This reduced likelihood ultimately decreases his incentive compensation.

140.    *Sixth*, the Final Rule will require Plaintiff to do greater engagement with other law enforcement and regulatory organizations, which will increase his operating expenses.

141.    Before the Final Rule, Plaintiff assisted his whistleblower clients in reporting their tips to the Commission and supported the Commission Staff in their investigations and related

prosecutions. If it was appropriate to refer certain matters or coordinate certain activities with other law enforcement and regulatory organizations, the Commission would be responsible for doing so.

142.     Under the Final Rule, however, the burden for engaging with other potential law enforcement and regulatory organizations has shifted to Plaintiff's clients. That is because if the Commission determines that another whistleblower program "has the more direct or relevant connection to the action," Plaintiff's clients will be denied an award for a related action. They therefore are strongly incentivized to apply to all programs that they may be eligible for. Furthermore, denials or prior awards from these other programs can prohibit them from receiving an award from the Commission. Accordingly, to ensure that they are deemed eligible and receive the maximum possible award from these programs, Plaintiff and his clients are now required to engage early and often with these other law enforcement and regulatory organizations. This is time consuming.

143.     *Seventh*, the Final Rule requires Plaintiff to do new monitoring while representing clients, which increases Plaintiff's operating expenses.

144.     Historically, Plaintiff's clients directly reported and assisted the Commission, and his clients didn't need to worry about related actions that may have resulted from or benefited from such engagement. Now, under the new rules, Plaintiff's clients are strongly incentivized to apply to other award programs and are penalized if they are denied an award or receive a small award from these other programs.

145.     Because the Final Rule doesn't limit its application to other award programs in existence at the time his clients file their tips, Plaintiff now has to continually monitor the award program landscape for new programs that his clients may be eligible for. Plaintiff also has to attempt to monitor the Commission's investigation to learn if the scope of wrongdoing has grown into another program's jurisdiction and/or the agency is now coordinating its efforts with other law enforcement and regulatory organizations. The monitoring required by the new rule will be time consuming.

146.     *Eighth*, the Final Rule will result in fewer potential clients choosing to report possible securities violations to the Commission because of the new risks the Final Rule introduces, thereby reducing Plaintiff's practice's revenue and his incentive compensation.

147.     Over the years, in virtually every consultation, potential whistleblowers have expressed concern to Plaintiff about retaliation and blacklisting within their industry. The more senior, salaried, and tenured the individuals have been, the greater this fear seems to be. Not surprisingly, the ability to report anonymously with employment protections has proven to be a critical factor in his clients' decision to participate in the SEC Whistleblower Program. In fact, approximately half of Plaintiff's current clients have elected to report anonymously. Unfortunately, most of the other whistleblower programs do not offer anonymous reporting and many of the programs don't offer employment protections. Accordingly, fewer of Plaintiff's potential clients will ultimately choose to blow the whistle. This, in turn, will lower Plaintiff's incentive compensation.

148.     *Finally*, the Final Rule will result in fewer potential clients choosing to report possible securities violations to the Commission because of the greater uncertainty it introduces, thereby reducing Plaintiff's practice's revenue and personal incentive compensation.

149.     As Commissioner Lee explained, the Final Rule "decreases certainty" for whistleblowers "by introducing a new, subjective standard, which is whether another agency's whistleblower program has a 'more direct or relevant connection to the action.'" Comm'r Allison Herren Lee, *June Bug vs. Hurricane: Whistleblowers Fight Tremendous Odds and Deserve Better* (Sep. 23, 2020), bit.ly/2TNOWZe. Compounding this problem, even if Plaintiff's clients are willing to assume the additional risk of participating in other award programs, these programs offer extraordinarily small whistleblower awards compared to the SEC Whistleblower Program.

150.     Accordingly, since the potential for large monetary awards is the primary motivator for external reporting, fewer of Plaintiff's potential clients will ultimately choose to report possible securities violations to the Commission. This, in turn, will decrease Plaintiff's incentive compensation.

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act, 5 U.S.C. §706
### Amendments to Rule 21F-6
### (Notice and Comment)

151.     Plaintiff incorporates all of its prior allegations.

152.     The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. §706(2)(D).

153.     The APA requires agencies to publish in a notice of proposed rulemaking "'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'" *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (quoting 5 U.S.C. §553(b)(3)). This means that the final rule must be "a logical outgrowth of the rule proposed." *Id.* (citation omitted).

154.     The purpose of this "logical outgrowth" rule "is one of fair notice." *Id.* It exists to prohibit agencies from "us[ing] the rulemaking process to pull a surprise switcheroo on regulated entities." *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

155.     "Notice of agency action is crucial to ensure that agency regulations are tested via exposure to diverse public comment, to ensure fairness to affected parties, and to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Daimler Trucks N.A. LLC v. EPA*, 737 F.3d 95, 100 (D.C. Cir. 2013) (cleaned up).

156.     "A final rule is a logical outgrowth of the proposed rule 'only if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their

comments on the subject during the notice-and-comment period.'" *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94-95 (D.C. Cir. 2010).

157.   The Final Rule violates the APA because it was not a "logical outgrowth" of the Commission's proposed rule. *Long Island Care at Home*, 551 U.S. at 174.

158.   Interested parties could not have anticipated that the Commission would claim that it already had the authority to base awards based on the dollar amount of monetary sanctions collected.

159.   Under its prior rules, the Commission had no authority to consider the amount of the monetary sanctions collected or the potential dollar amount of the award when calculating the whistleblower award.

160.   In the Proposed Rule, moreover, the Commission repeatedly and expressly acknowledged that it lacked this authority and therefore needed a new rule to grant the Commission this authority. In the Final Rule, however, the Commission flipped its position, concluding that it *already had* this authority. *See, e.g., Ctr. for Biological Diversity v. Everson*, 435 F. Supp. 3d 69, 97 (D.D.C. 2020) (finding that a final rule that is a "180 degree course change" from the proposal is not a logical outgrowth of the proposal).

161.   In addition, interested parties should not have anticipated that the Commission would draft a rule giving it total discretion to give lower awards based on the dollar amount. The Proposed Rule would have considered whether an award is too large only when the monetary sanctions collected exceeded $100 million, and it never would have applied a downward adjustment to provide an award less than $30 million. In the Final Rule, however, the Commission claimed the authority to base awards on dollar amounts collected with no limits whatsoever. This is far *worse* than the Proposed Rule.

162.   Finally, in the Proposed Rule, the Commission stated that its changes would apply only to *future* whistleblower applications. *See* Proposed Rule, 2018 WL 3238771, at *18 n.96 ("The Commission anticipates this proposed rule change, if adopted, would apply only to covered-action

and related-action award applications that are connected to a Notice of Covered Action . . . posted on or after [the] effective date of the final rules."). In the Final Rule, however, the Commission claimed that it had *always* had the authority to consider the size of the monetary sanctions collected and thus that it could give lower awards on this basis for whistleblower applications that were filed before the Final Rule was adopted.

163.    The Commission therefore "use[d] the rulemaking process to pull a surprise switcheroo," depriving commenters of notice and the opportunity to comment on this significant change to the formula for calculating whistleblower awards. *Envtl. Integrity Project*, 425 F.3d at 996.

164.    Because the Final Rule is a legislative rule that was promulgated without observance of the required notice-and-comment rulemaking procedures under the APA, it must be held unlawful and set aside. *See* 5 U.S.C. §706(2)(D).

## COUNT II
### Administrative Procedure Act, 5 U.S.C. §706
### Amendments to Rule 21F-6
### (Arbitrary and Capricious – Failure to Acknowledge Change)

165.    Plaintiff incorporates all of its prior allegations.

166.    The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).

167.    "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Id.* An agency "need not demonstrate . . . that the reasons for the new policy are better than the reasons for the old one." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis omitted). But "the agency must at least 'display awareness that it is changing position.'" *Encino*, 136 S. Ct. at 2126 (quoting *Fox*, 556 U.S. at 515).

168.    In explaining its changed position, an agency must also be cognizant that longstanding policies may have "engendered serious reliance interests that must be taken into account." *Encino*, 136 S. Ct. at 2126. "[A]n 'unexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Id.* (cleaned up) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-15 (2020).

169.    The Final Rule is arbitrary and capricious because it never acknowledges that it is reversing the Commission's previous rule and interpretations holding that the Commission could not, and thus would not, give a lower whistleblower award based on the size of the award's dollar amount.

170.    Under its prior rules, the Commission had no authority to consider the amount of the monetary sanctions collected (or the potential dollar amount of the whistleblower award) when calculating a whistleblower award.

171.    In the Proposed Rule, moreover, the Commission acknowledged that it lacked this authority. *See, e.g.*, Proposed Rule, 2018 WL 3238771, at *21 ("[U]nder the existing framework of Rule 21F-6 . . . the Commission in setting the appropriate amount of an award [is] unable to consider [any] extraordinarily large dollar amounts that [is] associated with any assessments and adjustments made when applying the existing award factors of Rule 21F-6; the Commission . . . also lack[s] the authority to adjust the award amount downward if it [finds] that amount unnecessarily large for purposes of achieving the whistleblower program's goals.").

172.    The Final Rule, however, asserted—for the first time—that the Commission *always* had the authority to consider the amount of the monetary sanctions collected (or the potential dollar amount of the whistleblower award) when calculating a whistleblower award. *See* Final Rule, 2020 WL 5763381, at *21-22, *72. The Final Rule purported to simply "clarify" the Commission's "existing

discretion" with an amendment to Rule 21F-6. *Id.* This change was transparently designed to reverse the Commission's old position and create new discretion. *See id.*

173.    In addition, by failing to acknowledge its change in policy, the Commission also ignored how whistleblowers have relied on the promise of the Dodd-Frank Act, and the Commission's prior rules, that an award would not be arbitrarily reduced simply because the Commission deemed its dollar amount to be "too large."

174.    Indeed, the Commission in the Final Rule claimed the discretion to lower whistleblower awards based on the size of the monetary sanctions for whistleblower applications that were filed *before* the Final Rule was adopted. Those individuals who blew the whistle and applied for an award under the old regime are now being deprived of their rights retroactively and without prior notice.

175.    Because the Commission did not "provide a reasoned explanation for the change" it made to Rule 21F-6, *Encino Motorcars*, 136 S. Ct. at 2125, the Final Rule's amendment to Rule 21F-6 must be held unlawful and set aside. *See* 5 U.S.C. §706(2)(A).

### COUNT III
### Administrative Procedure Act, 5 U.S.C. §706
### Exchange Act, 15 U.S.C. §78c(f)
### Amendments to Rule 21F-6
### (Arbitrary and Capricious – Failure to Weigh Costs and Benefits)

176.    Plaintiff incorporates all of its prior allegations.

177.    The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).

178.    The Exchange Act provides that when the SEC is "engaged in rulemaking" the SEC "shall also consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. §78c(f).

179.    The APA has a similar requirement. Under the APA, "[f]ederal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).

180.    In light of these requirements, the Commission acts "arbitrarily and capriciously . . . [when] it neglect[s] its statutory responsibility to determine the likely economic consequences of [a rule] and to connect those consequences to efficiency, competition, and capital formation." *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011); *see also Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005) (the SEC must "apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation"). Moreover, the Commission may not substitute for cost benefit analysis mere "ipse dixit, without any evidentiary support and unresponsive to [] contrary claim[s]." *Bus. Roundtable*, 647 F.3d at 1155. And the Commission must "provide[] substantial detail on the benefits of the rule" or "the reasons why quantification was not possible." *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, No. 1:16-CV-01460 (APM), 2020 WL 4816459, at *13 (D.D.C. Aug. 19, 2020) (citation omitted).

181.    The Final Rule's amendment to Rule 21F-6 is arbitrary and capricious because it does not "apprise itself—and hence the public and the Congress—of the economic consequences of [its] proposed regulation." *Chamber of Com.*, 412 F.3d at 144.

182.    The Final Rule does not engage in any cost-benefit analysis of its amendment to Rule 21F-6. According to the Commission, "[b]ecause these amendments only clarify the Commission's existing authority, . . . they will [not] have significant benefits, costs, and economic effects, . . . [and] will [not] significantly impact efficiency, competition, and capital formation." Final Rule, 2020 WL 5763381, at *72.

183.    That is wrong. The Final Rule reversed the Commission's previous rule and interpretations holding that the Commission could not, and thus would not, consider the amount of

the monetary sanctions collected when calculating a whistleblower award or provide a lower award based on the size of the potential dollar amount.

184.    Because the Final Rule failed to perform the required cost-benefit analysis, its amendment to Rule 21F-6 must be held unlawful and set aside. *See* 5 U.S.C. §706(2)(A).

**COUNT IV**
**Administrative Procedure Act, 5 U.S.C. §706**
**Amendments to Rule 21F-6**
**(Arbitrary and Capricious – Failure to Engage in Reasoned Decisionmaking)**

185.    Plaintiff incorporates all of its prior allegations.

186.    The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).

187.    Under the APA, the agency must engage in "reasoned decisionmaking." *Michigan*, 576 U.S. at 750 (citation omitted). The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). An agency rule is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

188.    The Final Rule fails this test for multiple reasons.

189.    The Commission asserted that it was simply "clarifying" that it always had the discretion to consider the potential size of the whistleblower award when calculating the award. Final Rule, 2020 WL 5763381, at *21-22. But this rationale contradicts a plain reading of the Commission's prior rules and the Commission's prior statements.

190.    In addition, the Final Rule gave the Commission discretion to reduce awards based on dollar amounts, creating a nebulous and arbitrary standard without any accountability. The Final Rule

- 41 -

empowers the Commission to effectively ignore the statutory award factors and reduce awards without telling whistleblowers or giving them an opportunity to challenge the reduction.

191.     Because the Final Rule is arbitrary and capricious, its amendments to Rule 21F-6 must be held unlawful and set aside. *See* 5 U.S.C. §706(2)(A).

**COUNT V**
**Administrative Procedure Act, 5 U.S.C. §706**
**Amendments to Rule 21F-6**
**(Contrary to Law)**

192.     Plaintiff incorporates all of its prior allegations.

193.     Under the APA, a reviewing court must hold unlawful and set aside agency action that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §706(2)(A), (C).

194.     "It is axiomatic that administrative agencies may act only pursuant to authority delegated to them by Congress." *Air All. Houston v. EPA*, 906 F.3d 1049, 1060 (D.C. Cir. 2018) (cleaned up). Therefore, if a provision of the Exchange Act is "clear," the Commission's regulations interpreting or implementing that provision "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Moreover, if a provision of the Exchange Act is either silent or ambiguous, the Commission's interpretation or implementation of it must be "based on a permissible construction of the statute." *Id.* at 843.

195.     Through the Final Rule, the Commission gave itself the discretion to reduce the "dollar amount" of a whistleblower award if it deems the award to be too large. Final Rule, 2020 WL 5763381, at *21-22, *72. This contradicts the plain language of the Exchange Act's whistleblower provisions and is an otherwise unreasonable construction of the statute.

196.     In Section 78u-6(c)(1)(B), Congress made clear that the Commission "shall not take into consideration the balance of the Fund" when "determining the amount of an award." 15 U.S.C. § 78u-6(c)(1)(B).

- 42 -

197.    Congress imposed this requirement because it wanted the whistleblower program "to be used actively with *ample rewards* to promote the integrity of the financial markets." S. Rep. No. 111–176 (2010) at 112 (emphasis added); *see also Digital Realty Tr.*, 138 S. Ct. at 777 ("The 'core objective' of Dodd-Frank's robust whistleblower program . . . is 'to motivate people who know of securities law violations to *tell the SEC*.'" (quoting S. Rep. No. 111–176, at 38) (citation omitted) (emphasis in original)).

198.    The Final Rule violates this text and statutory purpose. The Final Rule is designed to give the Commission power to give lower awards in order to preserve the balance of the Fund. Indeed, the Commission admitted in the Final Rule that it wanted to consider the dollar amount of the award in order to "foster more efficient use of the [Fund]." Final Rule, 2020 WL 5763381, at *72.

199.    Because the Final Rule's amendment to Rule 21F-6 contradicts the plain text of the Exchange Act and is otherwise an unreasonable construction of the statute, it must be held unlawful and set aside. *See* 5 U.S.C. §706(2)(A), (C).

## COUNT VI
### Administrative Procedure Act, 5 U.S.C. §706
### Amendments to Rule 21F-3
### (Contrary to Law)

200.    Plaintiff incorporates all of its prior allegations.

201.    Under the APA, a reviewing court must hold unlawful and set aside agency action that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §706(2)(A), (C).

202.    "It is axiomatic that administrative agencies may act only pursuant to authority delegated to them by Congress." *Air All. Houston*, 906 F.3d at 1060 (cleaned up). Therefore, if a provision of the Exchange Act is "clear," the Commission's regulations interpreting or implementing that provision "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. Moreover, if a provision of the Exchange Act is either silent or ambiguous, the

Commission's interpretation or implementation of it must be "based on a permissible construction of the statute." *Id.* at 843.

203.    The Exchange Act defines "related action" as "*any* judicial or administrative action brought by [specified entities] . . . that is based upon the original information provided by a whistleblower pursuant to subsection (a) that led to the successful enforcement of the Commission action." 15 U.S.C. §78u-6(a)(5) (emphasis added). The word "any" is all inclusive and not amenable to any limiting construction.

204.    The Exchange Act, in turn, requires that the Commission "*shall pay* an award . . . [in] the successful enforcement of . . . [the] related action, in an aggregate amount [of 10% to 30%]." 15 U.S.C. §78u-6(b)(1) (emphasis added).

205.    The Final Rule, however, amends Rule 21F-3 to give the Commission the discretion to deny a whistleblower award for "related actions" under certain circumstances, including if the Commission finds that another whistleblower program has "the more direct or relevant connection to the action." Final Rule, 2020 WL 5763381, at *82. The Commission has no statutory authority to impose this requirement.

206.    Rule 21F-3 is also an unreasonable interpretation of the statute. Rule 21F-3 disincentivizes individuals from becoming whistleblowers by, among other things, imposing numerous roadblocks on whistleblowers' eligibility to recover awards for "related actions."

207.    For example, if the Commission determines that an award for a "related action" is appropriate, the whistleblower now must make "a prompt, irrevocable waiver of any claim to an award from the other award program," even if the other program has not made a determination regarding the client's eligibility and award amount. This forces whistleblowers to blindly accept the first award offered to them, regardless of its size, rather than risk getting nothing.

208.     Similarly, the Final Rule places whistleblowers in a lose-lose situation. The Final Rule forces individuals to apply for as many whistleblower programs as possible to avoid the Commission determining that another whistleblower program "has the more direct or relevant connection to the action." At the same time, however, if another whistleblower program denies the individual's whistleblower application, for any reason, the Final Rule bars that individual from receiving an award from the Commission. This prohibition is mandated even though proceedings are not litigation, the proceedings are not governed by the same rules, and the proceedings don't involve the same parties. This punishment of whistleblowers is irrational.

209.     The Commission's rule contradicts the purpose of the statute, which is to create a whistleblower program that will "be used actively with ample rewards to promote the integrity of the financial markets." S. Rep. No. 111–176 (2010) at 112; *see also Digital Realty Tr.*, 138 S. Ct. at 777 ("The 'core objective' of Dodd-Frank's robust whistleblower program . . . is 'to motivate people who know of securities law violations to *tell the SEC.*'" (quoting S. Rep. No. 111–176, at 38) (citation omitted) (emphasis in original)).

210.     Because the Final Rule's amendment to Rule 21F-3 contradicts the plain text of the Exchange Act and is otherwise an unreasonable construction of the statute, it must be held unlawful and set aside. *See* 5 U.S.C. §706(2)(A), (C).

## COUNT VII
### Administrative Procedure Act, 5 U.S.C. §706
### Amendments to Rule 21F-3
### (Arbitrary and Capricious)

211.     Plaintiff incorporates all of its prior allegations.

212.     The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).

213.     Under the APA, the agency must engage in "reasoned decisionmaking." *Michigan*, 576 U.S. at 750 (citation omitted). The agency "must examine the relevant data and articulate a satisfactory

explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citation omitted). An agency rule is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

214.     The Final Rule fails this test. Rule 21F-3 disincentivizes individuals from becoming whistleblowers by imposing numerous roadblocks on whistleblowers' eligibility to recover awards for "related actions."

215.     For example, if the Commission determines that an award for a "related action" is appropriate, the whistleblower now must make "a prompt, irrevocable waiver of any claim to an award from the other award program," even if the other program has not made a determination regarding the client's eligibility and award amount. This forces whistleblowers to blindly accept the first award offered to them, regardless of its size, rather than risk getting nothing.

216.     Similarly, the Final Rule places whistleblowers in a lose-lose situation. The Final Rule forces individuals to apply for as many whistleblower programs as possible to avoid the Commission determining that another whistleblower program "has the more direct or relevant connection to the action." At the same time, however, if another whistleblower program denies the individual's whistleblower application, for any reason, the Final Rule bars that individual from receiving an award from the Commission. This prohibition is mandated even though proceedings are not litigation, the proceedings are not governed by the same rules, and the proceedings don't involve the same parties. This punishment of whistleblowers is irrational.

217.     These prohibitions are arbitrary and capricious because they harm potential whistleblowers and contravene Congress's purpose of encouraging whistleblowers to come forward to report securities violations.

218.    Because the Final Rule is arbitrary and capricious, its amendments to Rule 21F-3 must be held unlawful and set aside. *See* 5 U.S.C. §706(2)(A).

**WHEREFORE**, Plaintiff asks this Court to enter judgment in his favor and to provide him with the following relief:

a.   A declaratory judgment finding that the Final Rule's amendments to Rule 21F-6 are unlawful under the APA and the Exchange Act because the Commission failed to promulgate them through the proper notice-and-comment rulemaking procedures;

b.   A declaratory judgment finding that the Final Rule's amendments to Rule 21F-6 and Rule 21F-3 are arbitrary and capricious under the APA and the Exchange Act because the Commission failed to acknowledge its changes in policy, did not consider its costs and benefits, did not articulate a rational explanation for its changes, did not explain why it created a new arbitrary standard lacking accountability and transparency, disregarded reliance interests, and otherwise failed to engage in reasoned decisionmaking;

c.   A declaratory judgment holding that the Final Rule's amendments to Rule 21F-6 and Rule 21F-3 are contrary to law because they contradict the plain text of the Exchange Act and are otherwise an unreasonable construction of the statutory text;

d.   A declaratory judgment finding that the Final Rule's amendments to Rule 21F-6 and Rule 21F-3 are invalid;

e.   A declaratory judgment that the Commission had no authority under its prior rules to consider the amount of the monetary sanctions collected or the potential size of the whistleblower award when calculating a whistleblower award;

f.   A permanent injunction prohibiting Defendants from enforcing or implementing the Final Rule's amendments to Rule 21F-6 and Rule 21F-3;

g.  An order vacating and setting aside the Final Rule's amendments to Rule 21F-6 and Rule 21F-3;

h.  All other relief to which Plaintiff is entitled, including but not limited to Plaintiff's attorneys' fees and costs.

i.  All other relief that this Court deems just and proper.

Respectfully submitted,

Dated: January 13, 2021

*/s/   J. Michael Connolly*

J. Michael Connolly (DC Bar #995815)
Steven C. Begakis (*pro hac vice* forthcoming)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
steven@consovoymccarthy.com

*Counsel for Plaintiff Jordan Thomas*